1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28

United States District Court
Northern District of California

UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

San Francisco Division

PATRICIA C. NORTE,

        Plaintiff,

   v.

MICHAEL J. ASTRUE,

        Defendant.

No. C-12-01317-LB

**ORDER (1) GRANTING PLAINTIFF'S MOTION FOR SUMMARY JUDGMENT, (2) DENYING DEFENDANT'S CROSS-MOTION FOR SUMMARY JUDGMENT, AND (3) REMANDING FOR FURTHER CONSIDERATION**

[Re ECF Nos. 18, 21]

**INTRODUCTION**

    Plaintiff Patricia Norte moves for summary judgment, seeking judicial review of a final

decision by defendant Michael Astrue, the Commissioner of Social Security Administration (the

"Commissioner"), denying her Social Security Income ("SSI") disability benefits for her claimed

disability of heart problems, swelling in the leg, and injury to the inside of her right elbow.  Pl.'s

Mot., ECF No. 18;[1] Administrative Record ("AR") 64-65.  The Administrative Law Judge

---

[1]  Citations are to the Electronic Case File ("ECF") with pin cites to electronically-generated page
numbers at the top of the document.

C-12-01317-LB
ORDER

determined that Ms. Norte could not perform her past relevant work but that she was capable of performing other jobs that existed in significant numbers in the national economy.  AR 17-18.

Pursuant to Civil Local Rule 16-5, the matter is deemed submitted for decision by this court without oral argument.  All parties have consented to the court's jurisdiction.  ECF Nos. 4, 8.  For the reasons stated below, the court **GRANTS** Ms. Norte's motion for summary judgment, **DENIES** the Commissioner's cross-motion for summary judgment, and **REMANDS** this case for further reconsideration.

## STATEMENT

### I.  PROCEDURAL HISTORY

Ms. Norte, now 59 years old, filed a Title II application for a period of disability and disability insurance benefits on May 30, 2008.  AR 12, 100.  The Commissioner denied her application both initially and upon reconsideration.  AR 64, 73.  Ms. Norte timely requested a hearing before an ALJ.  AR 23.  An ALJ conducted a hearing on January 27, 2010 in San Francisco, California.  AR 31.  Ms. Norte appeared with her attorney, Mr. Harvey Sackett, and testified at the hearing along with vocational expert Joel Greenberg (the "VE").  AR 7, 29.

The ALJ issued a decision on March 16, 2010 and found that Ms. Norte was not disabled because she was capable of performing other jobs, such as a small producer assembler and an finishing inspector, that existed in significant numbers in the national economy.  AR 18-19.

Ms. Norte timely requested that the Appeals Council review the ALJ's decision.  AR 7.  The Appeals Council denied the request for review on January 17, 2012.  AR 1-3.  That denial rendered the ALJ's March 16, 2010 decision the Commissioner's final decision.  AR 1.

Ms. Norte filed a complaint for judicial review under 42 U.S.C. § 405(g).  Compl., ECF No. 1.  Ms. Norte and the Commissioner both now move for summary judgment.  Pl.'s Mot., ECF No. 18; Comm'r's Opp'n and Cross-mot., ECF No. 21.

### II.  SUMMARY OF RECORD AND ADMINISTRATIVE FINDINGS

This section summarizes (A) the medical evidence in the administrative record, (B) the vocational expert's testimony, (C) Ms. Norte's testimony, and (D) the ALJ's findings.

United States District Court
Northern District of California

A.  **Medical Evidence**

1.  ***Dr. David Goldschmid*** *02/28/00 to 04/07/00*

Ms. Norte has received medical treatment relating to her right elbow at Seton Medical Center ("SMC") for several years.  AR 296-336.  On February 28, 2000, David Goldschmid, a physician at SMC, completed an examination of Ms. Norte's injury.  AR 225.  Ms. Norte complained that she experienced a sharp pain in her elbow while moving a bag in the course of her work on February 27, 2000.  AR 33-34, 225.

When Dr. Goldschmid examined Ms. Norte, he found that her right elbow was "tender to palpation."  AR 225.  Dr. Goldschmid diagnosed Ms. Norte with medial epicondylitis on the right side and ordered her to refrain from working for approximately one week.  AR 225.

On March 6, 2000, Ms. Norte returned to SMC.  AR 222.  Dr. Goldschmid reported that Ms. Norte's condition improved since the last examination but her improvement was slower than expected.  AR 222.  In devising a treatment plan, Dr. Goldschmid referred her to physical therapy and prescribed Relafen.  AR 222.  Dr. Goldschmid also ordered her to refrain from working for approximately one week.  AR 221-22.

About two days later on March 8, 2000, Dr. Goldschmid authorized Ms. Norte to return work on the following day with "modified duty only."  AR 220.  Specifically, Dr. Goldschmid indicated that Ms. Norte may only perform light work.  AR 220.  This meant that she was restricted to "lifting 20 lbs. maximum with frequent lifting and/or carrying of objects weighting up to 10 lbs."  AR 220.  In addition, Dr. Goldschmid indicated that Ms. Norte was restricted to "[n]o pushing/pulling greater than 20 lbs."  AR 220.

About two weeks later, Ms. Norte visited Dr. Goldschmid.  AR 219.  Dr. Goldschmid reported that Ms. Norte tested positive on her right elbow for Franklin test and Varus stress test.  AR 219.  He opined that Ms. Norte's pain had worsened since her last exam and noted swelling in the right forearm and elbow.  AR 219.  Ultimately, he ordered Ms. Norte to refrain from working for approximately two weeks.  AR 218-19.

On April 7, 2000, Dr. Goldschmid opined that Ms. Norte's condition has worsened again since

United States District Court
Northern District of California

her last visit. AR 216. It appeared that Ms. Norte complained that there were "two very painful days" in the past week, leaving her unable to lift anything heavier than a pen. AR 216. She further complained that the "[s]lightest movement hurts." AR 216. As such, Dr. Goldschmid ordered her to refrain from working until she has seen a specialist for her condition. AR 215-16.

### 2. **Dr. Paul Roache** from 04/19/00 - 04/09/02

In an "Initial Office Evaluation" dated April 19, 2000, Dr. Paul Roache, an orthopedic surgeon, described Ms. Norte's history of her injury in the right elbow. AR 252. While lifting large items in the course of her work, "the medial aspect of Ms. Norte's right elbow began to become painful and made it difficult to carry on her work." AR 252. Dr. Roache reported that Ms. Norte recounted two previous episodes of injury to the same area. AR 252. "In that episode [meaning, the first injury in August 1997], however she said that [she] had a specific traumatic event where she fell on the forearm and never had x-rays." AR 252. On or about February 1998, she experienced the same symptoms. AR 252. Dr. Roache also indicated that Ms. Norte had "bilateral knee pain as a child, which was never diagnosed and is not resolved." AR 252.

With respect to medication, Dr. Roache reported that Ms. Norte "is on no medication." AR 252.

Dr. Roache conducted a physical examination of Ms. Norte. AR 253. He reported that the "lateral aspect [of her right elbow] had no tenderness or swelling," but the medial aspect had "exquisite tenderness over the medial epicondyle." AR 253. In conducting the physical examination, Dr. Roache found that "[t]he range of motion of the elbow was from 0-130" and "[s]upination and pronation was 90/90." AR 253. He further reported:

> There was no mechanical clicking or crepitus noted anywhere in the elbow, and no erythematous area noted. Grip strength was tested manually and was normal. Wrist flexors, wrist extensors, and intrinsics were 5/5. Elbow stability was tested. No posterolateral rotary instability was noted, as described by Dr. Shawn Discroll, and no lateral-sided instability was noted on various stress testing.

He recommended that Ms. Norte obtain x-rays and a Magnetic Resonance Imaging ("MRI") scan of her right elbow. AR 253. After obtaining the results, Dr. Roache reported that he would

United States District Court
Northern District of California

1    then reevaluate Ms. Norte.  AR 253.

2        In June 2000, Dr. Roache completed a "Worker's Compensation: Attending Physicians

3    Supplemental Report."  AR 249.  He estimated that Ms. Norte may "[r]eturn to work and resume

4    [f]ull [d]uties with [n]o [l]imitations" on July 15, 2000.  AR 249.

5        About two months later, Dr. Roache completed another "Worker's Compensation: Attending

6    Physicians Supplemental Report."  AR 246-47.  In the report, Dr. Roache indicated that Ms. Norte

7    may return to work with modified duties, restricting her from lifting no more than ten pounds.  AR

8    247.  He further noted that he was unable to determine Ms. Norte's "disability status at this time."

9    AR 247.

10       On that same day, to help alleviate Ms. Norte's pain, Dr. Roache prescribed and administered

11   a Celestone injection.  AR 244.  After the injection Ms. Norte felt some relief for about one week,

12   but the relief " was followed by very intense burning pains, and a return to the original symptoms

13   around the elbow."  AR 244.

14       In a report dated September 15, 2000, Dr. Roache explained that his provisional diagnosis was

15   "epicondylitis and possible medial collateral ligament injury."  AR 244.  After obtaining the

16   results of Ms. Norte's MRI and nerve conduction studies, Dr. Roache did not see any

17   abnormalities.  AR 244.  As such, he treated Ms. Norte conservatively with oral nonsteroidals and

18   ice and cleared her to return to modified work.  AR 244.  Specifically, the modification required

19   that Ms. Norte not lift "anything greater than 10 pounds with that right upper extremity."  AR 244.

20   Dr. Roache opined that Ms. Norte's employer did not have such modified work available.  AR

21   244.

22       In a physical examination, Dr. Roache noted that the tenderness over Ms. Norte's right medial

23   elbow remained.  AR 244.  In an effort to "try and break the chronic inflammation cycle," he

24   prescribed "one more round of physical therapy."  AR 244.  He also placed Ms. Norte's right arm

25   in a tennis elbow brace.  AR 245.

26       Dr. Roache indicated that he discussed the option of surgically releasing the scar tissue with

27   Ms. Norte.  AR 244.  In relevant part, he stated:

28

United States District Court
Northern District of California

I have discussed with her also that surgical release of the scar tissue and evaluation is an option.  It is an option, however, that there is not a great deal of experience with an orthopedic surgeon, since 95% of the people with this type of symptom actually resolve without any kind of surgical treatment.  My personal experience with lateral epicondylitis has been very positive with surgery, and recovery of normal function.  The medial side, however, still has a guarded prognosis at best, and we have discussed that.  Unfortunately, there are no guarantees ever with surgery, and this one in particular is a wait and see phenomenon.

AR 244-45.

On November 7, 2000, Dr. Roache completed the Workers' Compensation's "Primary Treating Physician's Permanent and Stationary Report."  AR 262.  In completing this report, Dr. Roache determined that Ms. Norte was "permanent and stationary" as of November 7, 2000.  AR 238, 241.  Despite this determination, he indicated that Ms. Norte may return to her usual occupation if modification is possible.  AR 262.  Dr. Roache also noted that Ms. Norte cannot lift more than 15 pounds with her right arm.  AR 263.

On January 16, 2001, Ms. Norte returned to see Dr. Roache.  AR 241.  Dr. Roache reported that the tenderness in the right arm did not change.  AR 241.  He also noted that Ms. Norte complained that her pain had worsened and the swelling has increased since her last visit.  AR 241.  Dr. Roache opined that his impression of Ms. Norte's condition is "continuing medial epicondylitis of the right arm, with ulnar nerve irritation."  AR 241.  Consequently, he ordered a repeat nerve conduction study and EMG to determine if the ulnar nerve is contributing to the injury.  AR 241.

On February 5, 2001, the American Commercial Claims Administrators (ACCA) asked Dr. Roache about his November 7, 2000 report.  AR 239.  Specifically, ACCA requested more information regarding Dr. Roache's conclusion that Ms. Norte is precluded from lifting over 15 pounds.  AR 239.  In response, Dr. Roache opined that Ms. Norte's present disability was not due to any other pre-existing condition, and that, before her injury, Ms. Norte could lift up to 100 pounds.  AR 239.  In the letter, he also reported that Ms. Norte should conduct "no forceful gripping and no lifting over 15 lbs[.]," and noted that Ms. Norte had "no pre-existing disability."  AR 239.

On January 25, 2002, Ms. Norte underwent surgery on her right elbow to alleviate her

symptoms.  AR 236.  Dr. Roache completed "[d]ebridement and fasciotomy of right lateral epicondylitis."  AR 236.  During a follow-up appointment on January 29, 2002, Dr. Roache placed a long-arm cast on Ms. Norte.  AR 235.  On February 19, 2002, Dr. Roache removed Ms. Norte's cast.  AR 234.  Dr. Roache examined the wound after the cast removed and found that it healed well but stiffness remained in Ms. Norte's right wrist.  AR 234.  He also prescribed physical therapy to assist with Ms. Norte's recovery.  AR 234.

About two months later, Dr. Roache evaluated Ms. Norte again.  AR 233.  He noted that Ms. Norte reported no significant resolution of pain in her affected elbow.  AR 233.  Moreover, she complained of "reoccurrence of the shooting left pains in the medial side of the elbow."  AR 233.  Ms. Norte still had "stiffness of the dorsum and of the right wrist" and moderate swelling of the hand.  AR 233.  Dr. Roache recommended "aggressive physical therapy for the hand and wrist to prevent further pain from stiffness, and expect[ed] full recovery of elbow range of motion over the next 6 weeks."  AR 233.  When Ms. Norte returned on April 9, 2002, Dr. Roache noted that Ms. Norte "continued [to experience] discomfort in the [right] elbow medial region" and opined that physical therapy had "not made any appreciable gains. "  AR 232.

On June 13, 2002, Dr. Roache completed a "Worker's Compensation Permanent and Stationary Report" for Ms. Norte.  AR 280.  Dr. Roache reported that "at this point [he will] discontinue any active treatment of the right elbow."  AR 280.  In deciding to discontinue any active treatment, Dr. Roache pointed to Dr. Skomer's neurological report, which showed no abnormalities in the right elbow's ulnar nerve, and Dr. McCarroll's report, which "showed no further abnormalities and treatments being required."  AR 280.

In that same report, Dr. Roache described Ms. Norte's pain in her right elbow and the development of the lateral epicondylitis in addition to the medial.  AR 280.  With the development of the lateral epicondylitis, Ms. Norte elected to receive surgery.  AR 280.  In relevant part, he stated:

> Of note, she had returned to her activities but had continued to report that her pain was getting worse in the right medial elbow.  She subsequently reported several flare-ups of the elbow pain.  She was reevaluated numerous times.  Numerous

United States District Court
Northern District of California

1
2
3

> medical treatments were instituted regarding the medial elbow.  She subsequently developed lateral epicondylitis.  Her acute lateral epicondylitis did not resolve in a timely fashion, and because of the debilitation of the medial and lateral side of the elbow, the patient elected to undergo an operative debridement of the lateral epicondylitis.

4   AR 280.  Ms. Norte indicated that she had "[n]o significant pain relief" after her debridement

5   surgery.  AR 280.

6       In light of the above-mentioned changes, Dr. Roache indicated that he would add "to the

7   permanent and stationary report, under subjective findings, elbow pain lateral, and would mark it

8   at the same level of frequency and severity as previously marked for medial."  AR 280.  He

9   reiterated the restriction that Ms. Norte should not lift anything greater than 15 pounds.  AR 280.

10  He told Ms. Norte that she should follow up as needed and that her "future medical treatment

11  should include potential injections, physical therapy, and reevaluation if required."  AR 280.

12          ***3.  Dr. David Stoller** *on 4/29/00*

13      In April 2000, Dr. David Stoller conducted a MRI of Ms. Norte's right elbow.  AR 227.  Dr.

14  Stroller found that the anterior bundle of the medial collateral ligament, the common flexor

15  tendon, the radial collateral ligament proper, lateral ulnar collateral ligament, the common

16  extensor tendon, the bicep tendon, and the brachialis tendon were all in intact.  AR 227.  Even

17  though the MRI revealed "intermediate signal intensity," "no hyperintensity is shown posterior to

18  the medial epicondyle."  AR 227.  He also found that the triceps tendon attachment was normal.

19  AR 227.

20          ***4.  Dr. Charles Skomer** *on 05/23/00*

21      Dr. Roache referred Ms. Norte to Dr. Charles Skomer for a nerve conduction studies to

22  determine "if the ulnar nerve is now a significant contributor to her current symptoms."  AR 238.

23      In May 2000, Dr. Skomer completed a "Bilateral Upper Extremity Nerve Conduction Velocity

24  and Electromyography Study."  AR 229-30.  Dr. Skomer found that the examination results

25  revealed "[n]ormal nerve conduction velocity study of the right upper extremity" and "[n]ormal

26  electromyography study of the bilateral upper extremities."  AR 230.  He also conducted a study

27  on the muscles and determined that there were no abnormal activities at rest.  AR 230.

28

United States District Court
Northern District of California

1

    **5.  *Dr. Stephen Conrad*** on 12/12/01 & 08/26/02

2

    Dr. Stephen Conrad completed two "Agreed Medical Evaluation[s]" of Ms. Norte.  AR 266.

3

    During the first evaluation in December 2001, Dr. Conrad described Ms. Norte's history of

4   injury with regard to her right elbow.  AR 291-92.  The report indicates that Ms. Norte had "a total

5   of four different injuries to the right elbow."  AR 293.  Dr. Conrad elaborated that "[a]ccording to

6   the history she provides, with confirmation by the medical records, she recovered from each prior

7   injury (26 August 1997, 16 April 1998, and 14 April 1999) so that there were no preexisting

8   factors of disability when she experienced a new onset of right elbow pain on 27 February 2000,

9   while lifting a trash bag at work."  AR 293.

10   Dr. Conrad characterized Ms. Norte's complaints of pain in her right elbow as "minimal to

11   slight intensity, occurring frequent[ly] with nonspecific movement, increasing to slight intensity,

12   intermittently, with pushing and pulling and further increasing to slight moderate intensity,

13   occasionally, with resisted torque movement, lifting and attempts at reaching. " AR 292.  He

14   found that "Ms. Norte demonstrates a limitation in right elbow motion." AR 292.  Moreover, Dr.

15   Conrad determined that Ms. Norte had "a positive Tinel's sign at the level of distal wrist crease."

16   AR 292.  He further described the pain and limitation associated with her right elbow.  In relevant

17   part, he stated:

18
19
> Grip strength is diminished on the right, dominant side.  Forced flexion and
> extension of the right wrist against resist[a]nce produces right elbow pain.  There is
> one-half inch arm wasting on the right in comparison to the left.

20

21   AR 292.  He expounded that Ms. Norte's "[g]rip strength is diminished by 40% below that

22   normally anticipated for the major extremity," and this was "consistent with Ms. Norte's

     complaint of right elbow pain. " AR 287, 293.

23

24   Ultimately, Dr. Conrad recommended that Ms. Norte return to Dr. Roache to seek treatment.

     AR 293-94.  Dr. Conrad also found that Ms. Norte is unable to return to her former work.  AR

25   294.  If modified work cannot be provided, Dr. Conrad recommended vocational rehabilitation.

26   AR 294.

27   In August 2002, Dr. Conrad conducted a second evaluation.  He reported that Ms. Norte had

28

C-12-01317-LB
ORDER                                                                                          9

United States District Court
Northern District of California

positive Tinel's sign at the level of the cubital tunnel.  AR 270.  Dr. Conrad explained,

> A 2-inch scar is present over the lateral epicondylar region of the right elbow.  The lateral epicondyle, olecranon, and medial olecranon regions are tender about the right elbow.  The medial epicondyle is also tender.  The Tinel's sign is positive at the level of the cubital tunnel on the right side.

AR 270.  Unlike his first evaluation, Dr. Conrad found that Ms. Norte's "Tinel's sign is negative at the distal wrist crease."  AR 270.  On the other hand, he found "[a] 75% deficit in grip strength is present on the right side, with a ½ inch level of muscular atrophy."  AR 277.  He also noted that "Ms. Norte has developed a flexion contracture of the right elbow, which was also present in December 2001."  AR 276.

Ultimately, Dr. Conrad opined that Ms. Norte had reached a "clinical plateau" and that she was "permanent and stationary on 26 August 2002. "  AR 276.  As such, Dr. Conrad opined that Ms. Norte should refrain from "heaving lifting, repeated torque-like movements, repeated pushing and pulling and all power grasping with the right dominant extremity."  AR 277.

### 6. Dr. Relton McCaroll on 06/03/02

Dr. Roache referred Ms. Norte to Dr. Relton McCarroll.  AR 256.  On June 3, 2002, Dr. McCarroll, Jr. examined Ms. Norte and diagnosed her with "[p]ersistent right medial elbow pain."  AR 256-57.  Even though Ms. Norte's condition was "suggestive of medial epicondylitis," Dr. McCarroll determined that the "area of tenderness is quite large and there is no localization within that area of the medial elbow."  AR 257.  He also indicated that he is "unable to find anything that suggests irritation or entrapment of the ulnar nerve."  AR 257.

Dr. McCarroll determined that Ms. Norte's pain is unlikely to be resolved through surgery.  AR 257.  Despite this determination, Dr. McCarroll indicated that "looking for areas of scar tissue [in surgery]. . . would be more likely to provide improvement."  AR 257.

### 7. Dr. Adele Makow on 09/12/04

On September 2004, Ms. Norte was admitted to the SMC emergency room, complaining of intermittent chest pain.  AR 324.  The emergency room staff performed an EKG and obtained chest x-rays of Ms. Norte.  AR 324-25.  Dr. Adele Makow reported that the EKG was normal and

United States District Court
Northern District of California

the chest x-ray showed cardiomegaly but it was otherwise normal.  AR 325.  During the

emergency visit, Dr. Adele Makow diagnosed Ms. Norte with "acute chest pain with abnormal

troponin."  AR 325.

### 8.  Dr. Michael Lai *on 09/12/04*

Dr. Michael Lai, the radiologist, found that Ms. Norte's cardiac silhouette is enlarged.  AR

330.  He also opined that "[t]here is prominence of the pulmonary vasculature, consistent with

mild pulmonary vascular congestion."  AR 330.  His impression of Ms. Norte's condition was 1)

mild pulmonary vascular congestion; and 2) cardiomegaly.  AR 330.

### 8.  Dr. Felix Millhouse *from 09/12/04 - 09/15/04*

During her emergency visit on September 12, 2004, Ms. Norte was hospitalized.  *See* AR 301.

Dr. Felix Millhouse examined Ms. Norte and found that she had "a seven-beat run of ventricular

tachycardia."  AR 301.  Indicating Ms. Norte's cardiac risk factor, Dr. Millhouse noted that Ms.

Norte smokes half pack of cigarettes per day, has hypertension, and is obese.  AR 301.

Dr. Millhouse's preoperative diagnosis was "anterior non ST segment elevation myocardial."

AR 318.  In light of this diagnosis, Dr. Millhouse performed the following procedures: 1) a left

heart catheterization; 2) a bilateral coronary angiography; 3) left ventriculogram; and 4)

implanting a "drug-eluting stent in the mid left anterior descending."  AR 318.  Dr. Millhouse's

postoperative diagnoses included severe double vessel coronary artery disease, severe stenosis of

the mid left anterior descending, and moderate stenosis of the distal right coronary artery.  AR

318.

Two days later, the hospital discharged Ms. Norte on September 15, 2004.  AR 301.  The

"Discharge Summary" indicated the following impression: 1) "status post non-ST elevated

myocardial infraction;" 2) "status post placement of drug-eluding stents to LAD, clinically stable;"

and 3) "status post ventricular tachycardia, no further arrhythmias, ischemia likely etiology."  AR

302.  To address her conditions, she was discharged with Levoxyl, Metoprolol, Aspirin, Plavix,

and Lipitor.  AR 302.

### 9.  Dr. David Ben-Aviv *on 08/09/08*

United States District Court
Northern District of California

On August 9, 2008, Dr. David Ben-Aviv of MDSI Physician Services conducted an orthopedic evaluation of Ms. Norte.  AR 171.  Dr. Ben-Aviv reported that Ms. Norte had negative Tinel's sign at the carpal tunnel and cubital tunnel.  AR 174.  In addition, he indicated that Ms. Norte had pain when attempting the cubital tunnel Tinel's sign.  AR 174.

> Today's history and physical examination are most consistent with considerable repetitive injury in her right arm including medial and lateral epicondylitis.  She also does have some symptoms of ulnar neuropathy on examination today, especially considering weakness of her fifth digit in abduction.  This may also account for some of the weakness and grip.  She also appears to have some lumber strain but no other signs of radiculopathy in the lower extremities.

AR 174.

He reported the following functional limitations: 1) capable of occasional and frequent lifting and carrying less than 10 pounds on the right side; 2) occasional bending, stooping, and crouching "secondary to potential worsening of the claimant's strain;" and 3) occasional grasping, reaching, and fingering items, and "secondary to potential worsening of her stress injury as well as some decreased sensation in her fingers."  AR 174-75.

### 10.  Dr. Matthew Gleason on 9/17/08

In September 2008, Dr. Gleason completed a "Physical Residual Functional Capacity Assessment" of Ms. Norte.  AR 178-82.  In the report, Dr. Gleason found that Ms. Norte's exertional limitation as follows: 1) occasionally and frequently lifting and/or carrying 10 pounds; and 2) stand and/or walk and/ or sit for a total of six hours in an eight-hour workday.  AR 179.  Despite some exertional limitation, Dr. Gleason did not find that Ms. Norte had any limitation on her ability to push and/or pull.  AR 179.

Dr. Gleason then indicated his opinion of Ms. Norte's postural limitations.  AR 180.  Due to Ms. Norte's extreme obesity, Dr. Gleason found that Ms. Norte may only occasionally climb ramps or stairs, stoop, kneel, crouch, and crawl.  AR 180.  In addition, Dr. Gleason also found that Ms. Norte should never climb ladder, rope, or scaffolds.  AR 180.  Despite these limitations, he found that Ms. Norte may frequently balance.  AR 180.

With respect to Ms. Norte's manipulative limitation in her right arm, Dr. Gleason

1   recommended that she may only occasionally engage in reaching, handling, fingering and

2   feeling.  AR 180.  There is no restriction on the left side of Ms. Norte's arm.  AR 180.

3       With respect to her environmental limitations, Dr. Gleason indicated only that Ms. Norte avoid

4   hazards such as machinery and heights due to her extreme obesity.  AR 181.

5       ***11.  Dr. Laurence Lief*** *on 08/14/08*

6       Mr. Norte was referred to Dr. Laurence Lief for a disability evaluation.  AR 176.  On August

7   14, 2008, Dr. Lief evaluated Ms. Norte.  AR 176.  His impression was that Ms. Norte suffered

8   from 1) coronary artery disease status post coronary artery angioplasty, 2) morbid obesity, 3)

9   smoking, and 4) bilateral chronic degenerative osteoarthritis of the knees.  AR 177.

10      In his report, Dr. Lief described Ms. Norte's September 2004 emergency room treatment at the

11   SMC.  AR 176.  He then reported that Ms. Norte had no chest pain or shortness of breath or

12   hospitalizations related to her cardiovascular problems after the emergency room visit.  AR 176.

13      Dr. Lief conducted a physical examination of Ms. Norte.  In his report, he noted that the

14   physical examination revealed that Ms. Norte's "[c]hest is clear to percussion and auscultation"

15   and her pulse was normal.  AR 176.  In relevant part, he stated:

16

17      On examination of the heart, the PMI is not palpable.  There is no heaves or thrills.
        S1 is within normal limits, there is a fourth heart sound, no third heart sound, and
18      rubs or murmurs.  Jugular venous pressure cannot be evaluated because of the short
        neck.  Right carotid has normal upstroke and the left carotid cannot be palpated.
19      Abdomen is obese, soft and organomegaly cannot be appreciated.  Extremities
        reveal a greenish scaly appearance to the pretibial region with chronic stasis
20      changes.  Pulses are not palpable.

21   AR 176-77.

22      Dr. Lief found that Ms. Norte "has no cardiovascular complaints that appear to be limiting her

23   and she seems to be medically impaired because of orthopedic reasons."  AR 177.  Ms. Norte

24   complained that she has "significant exercise intolerance[,] complaining of inability to walk up

25   stairs or on flat ground because of bilateral knee problems as well as a right elbow problem."  AR

26   176.  He opined that Ms. Norte's complaint regarding her inability to walk or climb stairs is "due

27   to her chronic arthritic changes in her knees and her elbow."  AR 176.  Because Ms. Norte "is

28   limited by her orthopedic problem and not her cardiovascular problem," Dr. Lief ultimately

C-12-01317-LB
ORDER                                                                                                    13

recommended that Ms. Norte obtain an orthopedic evaluation.  AR 177.

### 12.  *St. Mary's Medical Center* *from 02/04/09 – 10/20/09*

On March 27, 2009, Ms. Norte was admitted to St. Mary's Medical Center for bilateral leg, foot swelling, and severe stasis disease.  AR 445.  Dr. Robert Murray found that Ms. Norte had "an open wound at the left lateral leg, and notable inflammation and swelling of the left leg."  AR 445.  Dr. Murray found that "the study does not indicate any evidence of deep vein thrombosis of the lower extremities."  AR 445.  In his impression of Ms. Norte's condition, he noted "greater saphenous insufficiency . . . bilaterally."  AR 445.  Moreover, he indicated that "there appears to be enlarged, vascularized lymph nodes at the left groin area."  AR 445.

On May 11, 2009, Ms. Norte received care to a wound on her left leg.  AR 367.  The report indicated Ms. Norte's leg was "still very swollen."  AR 367.

Ms. Norte has also visited Saint Mary's Medical Center on several occasions regarding pain in her right knee.  AR 338, (noting pain right knee on 09/15/09), 344 (noting pain in both knees on 08/05/09), 346 (noting pain in right knee on 08/03/09).

On April 27, 2009, Ms. Norte went to Saint Mary's Medical Center complaining of shortness of breath and tachycardia.  AR 375-78.  CT imaging of her chest was performed, but did not result in a definite finding of the cause of her symptoms.  *See* AR 375-76.

### B.  Vocational Expert

Joel Greenberg, the VE, identified Ms. Norte's past relevant work as 1) a warehouse worker, DOT (#922.687-058), at SVP 2 and a medium exertional level; and 2) a shipping and receiving clerk, DOT (#222.387-050), at SVP 5 and a medium exertional level.  AR 45.

The ALJ asked the VE to consider whether an individual who is able to lift 20 pounds with her left arm, 15 pounds with her right arm, and "in some combination of sitting, standing, and walking complete a full eight hour day and within the eight hour day individually sit, stand, or walk for up to six hours each" would be able to perform Ms. Norte's past relevant work.  AR 45-46.[2]  The VE

---

[2]  First, the ALJ asked the VE to consider whether an individual "who is able to lift 20 pounds with her left and only 15 pounds with her right arm and is able to sit, stand, and walk for six hours in an eight hour day" would be able to perform Ms. Norte's past relevant work.  AR 45-46.  The

responded that Ms. Norte would not be able to perform her past relevant work.  AR 46.

The ALJ then asked about other jobs the claimant might be able to perform.  AR 47.  The VE stated that "with an ability to lift 20 pounds with her left, 10 pounds with her right or 15 pounds with her right and able to sit, stand and walk throughout the day six hours and complete an eight hour workday, there would be positions available."  AR 47.  Specifically, she could work as a 1) small product assembler I (DOT# 706.684-022) with light exertional level and SVP at 2; and 2) finish inspector (DOT# 741.687-010) with light exertional level and SVP at 2.  AR 48.

In determining the number of positions available nationally and locally, the VE took into account a 75% erosion due to "the sit/stand kind of option."  The VE explained that this erosion was necessary because "a lot of those jobs in production would require them being on the feet for the majority of the day."  AR 48.  With a 75% erosion, the VE found that there are 70,000 small product assembler jobs in the United States, 8,000 in California, 750 in San Francisco.  AR 47. With respect to the finish inspector, there are 110,000 jobs nationally, 12,000 in California and 1,200 in San Francisco.  AR 48.

Ms. Norte's counsel asked a hypothetical including a limitation to occasional reaching, handling, fingering, and feeling "with the left and on the right 'occasional' is closer to 0 than it is 33%."  AR 54.  The VE agreed with Ms. Norte's counsel that Ms. Norte would not be able to perform any jobs.  AR 54.

The ALJ then asked if there are any other jobs that Ms. Norte could perform.  Other than these two positions, the VE could not find any other jobs that an individual "with all the factors" mentioned.  AR 54-55.  He explained that "[w]hen I find that there's limitation to occasional

_____

VE responded that Ms. Norte would not be able to perform her past relevant work.  AR 46.  When the ALJ asked if such an individual is able to perform any other jobs, the VE found that she would not given the six-hour limitation.  AR 46.  The VE expounded, "if that's all they could do in a day, they wouldn't be able to work in an eight hour day."  AR 46.

With the VE's response, the ALJ rephrased his question and asked the VE to consider a hypothetical where an individual "in some combination of sitting, standing, and walking complete a full eight hour day and within the eight hour day individually sit, stand, or walk for up to six hours each."  It appears that the ALJ is rephrasing a portion of his first hypothetical to clarify the portion of the hypothetical concerning the ability "to sit, stand, and walk for six hours in an eight hour day."

1    manipulative positions . . . there really is no labor market that I can think of that would make

2    sense." AR 55.

3    **C. Ms. Norte's Testimony**

4    Ms. Norte testified before the ALJ at a hearing conducted on January 27, 2012. AR 29. Ms.

5    Norte testified about the history of her employment. In her most recent employment, Ms. Norte

6    served as a lead warehouse/concession worker at the San Francisco Zoo. AR 33. She served in

7    this capacity for five years. AR 33. After injuring her right elbow on February 27, 2000, Ms.

8    Norte attempted to return to work with modified duty. AR 33. This proved difficult because it

9    aggravated her injury. AR 33. Consequently, she had to discontinue working permanently. AR

10   33. She explained, "so then, they took me off modified work and told me not to work 'cause it

11   wasn't helping." AR 33.

12   Prior to serving as lead warehouse/concession worker, Ms. Norte served as a shipping clerk at

13   Kendall and Graham. AR 33, 283. In this capacity, she packed and shipped items in a warehouse

14   for a year and a half. AR 33-34.

15   Prior to her employment at Kendall and Graham, Ms. Norte served as an operations manager

16   at Bay Point Electric for approximately one year. AR 34, 283. In this capacity, Ms. Norte packed

17   and received orders and answered telephone calls. AR 34.

18   Prior to serving as an operations manager, Ms. Norte worked at J.B. Calder Company for 15

19   years in an office where she shipped, received, and packed orders. AR 34.

20   Ms. Norte testified that she received physical therapy twice a week for two weeks but did not

21   feel that her injury was improving. AR 35. Thereafter, she was referred to Dr. Roache, who

22   initially put her in a splint but later performed surgery on her elbow and put her in a cast. AR

23   35. She said that Dr. Roache was not sure why her elbow did not get better after surgery. AR

24   36. He ordered an MRI and two nerve tests. AR 36. These tests did not show any problems. AR

25   36.

26   Despite surgery, Ms. Norte testified that the pain in her elbow did not improve. AR 36. She

27   continues to experience aching and low-grade throbbing at all times. AR 36. In addition, she

28

United States District Court
Northern District of California

C-12-01317-LB
ORDER

16

stopped receiving treatment for her elbow from Dr. Roache because she was not eligible to see him through Worker's Compensation. AR 37. Ms. Norte testified that the condition of her right arm is the same as it was in 2005. AR 43.

Ms. Norte testified that she is unable to work because she has back and knee pain and is not able to sit for long periods of time. AR 37. Constant repetitive motion aggravates her elbow and arm on her dominant, right side. AR 37. She can sit for approximately 20 minutes in a soft, comfortable chair, before her back starts hurting and her arm goes numb. AR 37-38. Her maximum sitting capacity before needing to get up ranges from 20-30 minutes. AR 38. She can walk for about 10-15 minutes before needing to stop and rest. AR 38. And she can lift things that are really light, maybe about two pounds, but she has not been able to lift anything really heavy in a long time. AR 38. With her left hand, she can lift a gallon of milk. AR 38. Although she has a driver's license, Ms. Norte does not drive because it is too hard on her back and knees. AR 38.

With respect to chores, Ms. Norte does not go grocery shopping, do the dishes, cooking, or sweeping. AR 38-39. She leaves her house every day for about one to two hours. AR 39. She vacuums once a month and does some laundry. AR 38, 40-41. When Ms. Norte conducts these tasks, she testified that she must basically do everything with her left hand. AR 38, 40-41.

**C. ALJ's Findings**

Applying the sequential evaluative process, on March 26, 2010, the ALJ held that Ms. Norte was not disabled under § 216(i) and 223(d) of the Social Security Act and therefore was not entitled to disability insurance benefits. AR 19.

At step one, the ALJ found that the Ms. Norte did not engage in substantial gainful activity during the period from her alleged onset date of February 27, 2000, through her last insured date, December 31, 2005. AR 14.

At step two, the ALJ found Ms. Norte suffered from the following severe impairments: right elbow lateral epicondylitis, double vessel coronary artery disease, and obesity. AR 14.

At step three, the ALJ found Ms. Norte did not suffer from an impairment or combination of impairments that either was listed in the regulations or was medically equivalent to one of the

1   listed impairments.  AR 14.

2      The ALJ then determined Ms. Norte's residual functional capacity ("RFC") in order to assess

3   at steps four and five whether she could perform her past relevant work or any other work

4   considering her age, education, and work experience.  The ALJ found that Ms. Norte had the RFC

5   to perform light work as defined in 20 C.F.R. § 404.1567(b), except that she can lift 20 pounds (no

6   more than 15 pounds with the right upper extremity) and can sit, stand, and walk for 6 hours out of

7   an 8 hour day.  AR 14.  In making this RFC finding, the ALJ considered the symptoms and how

8   consistent they were with the objective medical evidence (based on the requirements of 20 C.F.R.

9   § 404.1529 and Social Security Rulings 96-4p and 96-7p).  AR 15.  He also considered opinion

10   evidence under 20 C.F.R. § 404.1527 and Social Security Rulings 96-2p, 96-5p, 96-6p, and 06-3p.

11   AR 15.

12      In considering Ms. Norte's symptoms, the ALJ stated he must follow a two-step process in

13   which it must first be determined whether there is an underlying medically determinable physical

14   impairment, and then he must evaluate the intensity, persistence and limiting effects of the

15   claimant's symptoms to determine the extent to which they limit the claimant's functioning.  AR

16   15.  For the second part, whenever Ms. Norte's statements about the intensity or functionally

17   limiting effects of pain or other symptoms were not substantiated by objective medical evidence,

18   the ALJ made findings on the credibility of the statements based on "the entire case record."  AR

19   15.

20      The ALJ described Ms. Norte's testimony at the hearing.  First, the ALJ described Ms. Norte's

21   testimony regarding her work experience.  AR 15.  He observed that Ms. Norte last's employment

22   was at the San Francisco Zoo.  AR 15.  After receiving an injury while working at the zoo, the

23   ALJ opined that she stopped working permanently in March 2000.  AR 15.  Prior to her

24   employment at the zoo, Ms. Norte worked at the warehouse of a toy store for a year and a half.

25   AR 15.  Prior to her employment at the toy store, she shipped and received orders and answered

26   phone calls for an electrical company for one year.  AR 15.  Lastly, prior to her employment at the

27   toy store, Ms. Norte worked in an office where shipped and received items for 13 years.  AR 15.

28

United States District Court
Northern District of California

The ALJ then described Ms. Norte's claim as to why she is disabled and the symptoms related to her disability. AR 15. With respect to her disability, the ALJ observed that Ms. Norte testified that she is not able to work due to "a bad back and bad knees." AR 15. This, she explains, "cause[s] difficulty with sitting and walking." AR 15. Moreover, Ms. Norte testified that she is unable to complete "repetitive work" with her "dominant right hand." AR 15. Despite physical therapy and surgery, Ms. Norte testified that she "continues to experience a little throbbing all the time and has difficulties picking things up." AR 15.

After recounting Ms. Norte's testimony regarding her injuries and symptoms, the ALJ then described Ms. Norte's daily activities. AR 15. Ms. Norte testified that she watches television, "gets up and walks around," and goes out shopping with a friend every day for one to two hours. AR 15. On the other hand, Ms. Norte testified she does not engage in basic chores such as grocery shopping, laundry, vacuuming, cooking or dishwashing. AR 15.

The ALJ then turned to Ms. Norte's testimony regarding her physical limitations. AR 15. The ALJ observed that Ms. Norte testified that she has difficulty standing and/ or walking. AR 15. At most, she can only stand for 15 minutes, walk for 30 minutes, and sit 15 minutes. AR 15. She can also lift a gallon of milk with her left hand. AR 15.

The ALJ observed that the record shows that Ms. Norte's "dominant right upper extremity was injured" while working on February 27, 2000. AR 15. Her injury occurred when she picked up a large bag and felt something snap. AR 15.

The ALJ stated that clinical findings revealed a decreased range of motion secondary to pain, and medial epicondylitis tenderness to palpation. AR 15. Dr. Goldschmid diagnosed Ms. Norte with medial epicondylitis on the right side. AR 15. As such, he ordered her to refrain from working for several weeks but her symptoms did not improve. AR 15. The ALJ opined that Ms. Norte attempted modified duty "on light but was unable to proceed." AR 15.

The ALJ then described Dr. Roache's opinion. AR 16. Dr. Roache ruled out flexion tendon injury, medial epicondylitis, and MCL ligament injury as the diagnosis. AR 16 (citation omitted). The MRI of Ms. Norte's right elbow taken on April 29, 2000 showed "intact medial

collateral ligament and lateral ulnar collateral ligament as well as radial collateral ligament." AR 16 (citation omitted).  The ALJ also noted that the NCS/EMG obtained on May 23, 2000 was also within normal limits.  AR 16 (citation omitted).  Even though Ms. Norte had a "cortisone injection of the medial epicondyle," the ALJ opined that she only received "short term relief." AR 16.  A few months later, Dr. Roache determined that Ms. Norte was "permanent and stationary" and "precluded her from forceful gripping and lifting over 15 pounds." AR 16 (citation omitted).  The ALJ then went on to state that the "[r]epeat EMG in November 2001 was normal . . . [and] [o]n January 25, 2002, the claimant underwent debridement and fasciotomy of right lateral epi[c]ondylitis." AR 16 (citation omitted).

He found that the follow-up appointment on March 5, 2002 showed "no significant resolution" in Ms. Norte's right elbow pain and reoccurrence of the shooting left pain in the medial side of the elbow.  AR 16.  Dr. Roache reported "stiffness in the dorsum of the right wrist and swelling of the hand." AR 16.  Even though Dr. Roache recommended aggressive physical therapy, Ms. Norte continued to report no improvement with regard to her symptoms.  AR 16 (citation omitted).

The ALJ then described Dr. McCarroll's opinion.  AR 16.  Dr. McCarroll diagnosed Ms. Norte with "persistent right medial pain."  Even though Dr. McCaroll found that Ms. Norte's "area of tenderness is quite large and therefore "suggestive of medial epiocndylitis, there was "no localization within that area of the medial elbow." AR 16.  More importantly, Dr. McCarroll did not find anything that would suggest irritation or entrapment of the ulnar nerve.  AR 16.  Ultimately, Dr. McCarroll advised against further surgery.  AR 16 (citation omitted).

The ALJ then referred to Dr. Roache's June 13, 2002.  AR 16.  In light of Dr. Skomer's report and Dr. McCarroll's report, Dr. Roache discontinued "any active treatment of the right elbow." AR 16.  Even though Ms. Norte returned to her normal activities, Dr. Roache opined that she reported that the pain worsened in the right medial elbow.  AR 16.  The ALJ also noted that Ms. Norte reported several flare ups of elbow pain.  AR 16.  As such, Dr. Roache restricted Ms. Norte from lifting anything greater than 15 pounds.  AR 16 (citation omitted).

Next, the ALJ described Dr. Conrad's opinion.  AR 16.  In examining Ms. Norte, Dr. Conrad

found "there was a 2-inch scar present over the lateral epicondylar region of the right elbow."  AR 16.  Moreover, both the medial and lateral portion of the elbow continued to be tender.  AR 16.  He also found a positive Tinel's sign at the cubital tunnel on the right side.  AR 16.  In addition, the ALJ indicated that Dr. Conrad's examination revealed "hyperthesia over the ulnar border of the right hand, a 75% deficit in grip strength on the right side, and a 1/2-inch level of muscular atrophy."  AR 16.  The ALJ noted that Dr. Conrad determined that Ms. Norte was "permanent and stationary as of 2002" and indicated a limitation for "heavy lifting, repeated torque-like movements, repeated pushing and pulling and all power grasping with right dominant extremity."  AR 16 (citation omitted).

After describing Dr. Conrad's opinion, the ALJ turned to Ms. Norte's emergency visit at the SMC.  AR 17.  Because Ms. Norte went to the emergency room with "onset of non-ST elevated myocardial infraction," the ALJ observed that she was admitted to the hospital from September 12, 2004 to September 15, 2004.  AR 17.  During the hospital stay, she underwent angiogram, revealing "severe stenosis in the proximal mid LAD, and normal LV function."  AR 17.  Moreover, the ALJ noted that Ms. Norte "had placement of a Taxus 3.018 drug-eluting stent to her LAD."  AR 17.  The ALJ indicated that Ms. Norte was discharged on September 15, 2004 with "diagnosed status post non-ST elevated myocardial infraction, status post placement of drug-eluting stents to LAD, clinically stable, status post ventricular tachycardia, no further arrhythmias, ischemia likely etiology; smoking, cessation started and goiter."  AR 17 (citation omitted).

Next, the ALJ discussed the reason why he found that Ms. Norte was not credible.  The ALJ reasoned that the "weight of the objective evidence" did not support Ms. Norte's "claims of disabling limitations to the degree alleged."  AR 17.  First, the ALJ pointed to the EMC and NCS reports, revealing "no abnormalities in the ulnar nerve or the right elbow."  AR 17.  He also referred to Dr. McCarroll's opinion that he "was unable to find anything that suggested irritation or entrapment of the ulnar nerve and advised against further surgery."  AR 17.  The ALJ also pointed to Dr. Roache's opinion to discontinue "active treatment of the right elbow and restricted the claimant to no lifting great than 15 pounds."  AR 17.  Lastly, he referred to Dr. Conrad's

United States District Court
Northern District of California

1    opinion to preclude Ms. Norte from "heavy lifting, repeated torque-like movements, repeated

2    pushing and pulling and all power grasping with right dominant extremity."  AR 17.

3        With respect to the medical evidence, the ALJ provided a general statement as to the weight it

4    gave to each physician or psychologist.  In relevant, the ALJ stated:

> As for opinion evidence, in accordance with Social Security Ruling 96-6p, the
> Administrative Law Judge has considered the administrative findings of fact made
> by the State agency medical physicians and other consultants.  These opinions are
> weighted as statements from nonexamining expert sources.  The opinions of the
> State agency physician and consultant who completed the physical residual
> functional capacity assessments are given more weight because their opinions are
> supported by the record.  In accordance with § 404.1527, the opinions of the
> claimant's treating sources are given more weight because they had the opportunity
> to treat the claimant.

10   AR 17.

11       Having determined Ms. Norte's RFC, the ALJ proceeded with steps four and five of the

12   sequential evaluative process.

13       At step four, the ALJ found that Ms. Norte was not capable of performing her past relevant

14   work.  AR 35.  As the VE had testified, the ALJ found that the DOT classifies Ms. Norte's past

15   relevant work as follows: 1) a warehouse worker, DOT (#922.687-058), at SVP 2 and a medium

16   exertional level; and 2) a shipping and receiving clerk, DOT (#222.387-050), at SVP 5 and a

17   medium exertional level.  AR 17.  Although the ALJ did not explicitly state this, the physical

18   demands of Ms. Norte's past relevant work exceeded the RFC.  AR 17.  Therefore, based on the

19   VE's testimony, the ALJ concluded that Ms. Norte was not capable of performing her past

20   relevant work as a warehouse worker or a shipping and receiving clerk.  AR 17.

21       At step five, the ALJ noted that Ms. Norte was an "individual closely approaching advanced

22   age" pursuant to 20 C.F.R. § 404.1563.  AR 18.  He also indicated that transferability of skills was

23   not a material issue because the Medical-Vocational Rules supports a finding that Ms. Norte is not

24   disabled regardless if she has a transferable skill.  AR 18.

25       The ALJ then found that, through Mr. Norte's last insured date, considering her age,

26   education, work experience, and residual functional capacity, there were jobs that existed in

27   significant numbers in the national economy that Ms. Norte could have performed.  AR 17-

28

United States District Court
Northern District of California

C-12-01317-LB
ORDER

18.  Specifically, she could have performed the following two occupations: 1) small products assembler, DOT (#706.684-022), at SVP 2 and a light exertional level with 70,000 positions in the United States, 8,000 in California, and 750 in San Francisco; and 2) finishing inspector, DOT (#741.687-010), at SVP 2 and a light exertional level with 110,000 positions in the United States, 12,000 in California, and 1,200 in San Francisco.  AR 18.

The ALJ described the hypotheticals posed by Ms. Norte's counsels and then rejected it.  AR 18.  In rejecting the hypothetical, the ALJ reasoned that that the hypotheticals were "not supported by the evidence as a whole."  AR 18.

The ALJ thus concluded that the Ms. Norte was not under a disability, as defined in the Social Security Act, at any time from the alleged date of February 27, 2000.  AR 18.

## ANALYSIS

Ms. Norte challenges the ALJ's decision on five grounds: (1) the ALJ failed to give the appropriate weight to the opinions of the physicians who treated, examined or evaluated; (2) Ms. Norte the ALJ's RFC is not supported by substantial evidence; (3) the ALJ's hypothetical failed to properly include all of Ms. Norte's limitation; and (4) the ALJ erred by improperly rejecting Ms. Norte's testimony.

## I.  LEGAL STANDARD

### A.  Standard of Review

Under 42 U.S.C. § 405(g), district courts have jurisdiction to review any final decision of the Commissioner if the plaintiff initiates the suit within 60 days of the decision.  District courts may set aside the Commissioner's denial of benefits only if the ALJ's "findings are based on legal error or are not supported by substantial evidence in the record as a whole."  42 U.S.C. § 405(g); *Vasquez v. Astrue*, 572 F.3d 586, 591 (9th Cir. 2009) (quotation omitted).  "Substantial evidence means more than a mere scintilla but less than a preponderance; it is such relevant evidence as a reasonable mind might accept as adequate to support a conclusion."  *Andrews v. Shalala*, 53 F.3d 1035, 1039 (9th Cir. 1995).  If the evidence in the administrative record supports both the ALJ's decision and a different outcome, the court must defer to the ALJ's decision and may not

United States District Court
Northern District of California

substitute its own decision.  *See id.*; *accord Tackett v. Apfel*, 180 F.3d 1094, 1097-98 (9th Cir. 1999).

### B.  Applicable Law: Five Steps to Determine Disability

An SSI claimant is considered disabled if (1) he suffers from a "medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than twelve months," and (2) the "impairment or impairments are of such severity that he is not only unable to do his previous work but cannot, considering his age, education, and work experience, engage in any other kind of substantial gainful work which exists in the national economy."  42 U.S.C. § 1382c(a)(3)(A) & (B).

The Social Security regulations set out a five-step sequential process for determining whether a claimant is disabled within the meaning of the Social Security Act.  *See* 20 C.F.R. § 404.1520. The five steps are as follows:

**Step One.**  Is the claimant presently working in a substantially gainful activity?  If so, then the claimant is "not disabled" and is not entitled to benefits.  If the claimant is not working in a substantially gainful activity, then the claimant's case cannot be resolved at step one, and the evaluation proceeds to step two.  *See* 20 C.F.R. § 404.1520(a)(4)(i).

**Step Two.**  Is the claimant's impairment (or combination of impairments) severe?  If not, the claimant is not disabled.  If so, the evaluation proceeds to step three.  *See* 20 C.F.R. § 404.1520(a)(4)(ii).

**Step Three.**  Does the impairment "meet or equal" one of a list of specified impairments described in the regulations?  If so, the claimant is disabled and is entitled to benefits.  If the claimant's impairment does not meet or equal one of the impairments listed in the regulations, then the case cannot be resolved at step three, and the evaluation proceeds to step four.  *See* 20 C.F.R. § 404.1520(a)(4)(iii).

**Step Four.**   Considering the claimant's RFC, is the claimant able to do any work that he or she has done in the past?  If so, then the claimant is not disabled and is not entitled to benefits.

United States District Court
Northern District of California

United States District Court
Northern District of California

1    If the claimant cannot do any work he or she did in the past, then the case cannot be resolved

2    at step four, and the case proceeds to the fifth and final step.  *See* 20 C.F.R. §

3    404.1520(a)(4)(iv).

4    **Step Five.**  Considering the claimant's RFC, age, education, and work experience, is the

5    claimant able to "make an adjustment to other work?"  If not, then the claimant is disabled and

6    entitled to benefits.  *See* 20 C.F.R. § 404.1520(a)(4)(v). If the claimant is able to do other

7    work, the Commissioner must establish that there are a significant number of jobs in the

8    national economy that the claimant can do.  There are two ways for the Commissioner to show

9    other jobs in significant numbers in the national economy: (1) by the testimony of a vocational

10   expert or (2) by reference to the Medical-Vocational Guidelines at 20 C.F.R., part 404, subpart

11   P, app. 2.  If the Commissioner meets this burden, the claimant is not disabled.

12   For steps one through four, the burden of proof is on the claimant.  At step five, the burden

13   shifts to the Commissioner.  *See Tackett*, 180 F.3d at 1098

14   **II.   APPLICATION**

15   **A.   Failing to Give Proper Weight to Physicians**

16   Ms. Norte contends that the ALJ erred by failing to provide proper weight to the treating,

17   examining, and non-examining sources.  Pl.'s Mot., ECF No. 18.  When determining whether a

18   claimant is disabled, the ALJ must consider each medical opinion in the record together with the

19   rest of the relevant evidence.  20 C.F.R. § 416.927(b); *Zamora v. Astrue*, No. C 09-3273 JF, 2010

20   WL 3814179, at *3 (N.D. Cal. Sept. 27, 2010).  "By rule, the Social Security Administration

21   favors the opinion of a treating physician over non-treating physicians."  *Orn v. Astrue*, 495 F.3d

22   625, 631 (9th Cir. 2007) (citing 20 C.F.R. § 404.1527).  "The opinion of a treating physician is

23   given deference because 'he is employed to cure and has a greater opportunity to know and

24   observe the patient as an individual.'"  *Morgan v. Comm'r of the Soc. Sec. Admin.*, 169 F.3d 595,

25   600 (9th Cir. 1999) (citing *Sprague v. Bowen*, 812 F.2d 1226, 1230 (9th Cir. 1987)).  "However, the

26   opinion of the treating physician is not necessarily conclusive as to either the physical condition or

27   the ultimate issue of disability."  *Id.* (citing *Magallanes*, 881 F.2d at 751 and *Rodriguez v. Bowen*,

28

876 F.2d 759, 761-62 & n.7 (9th Cir. 1989)).

"If a treating physician's opinion is 'well-supported by medically acceptable clinical and laboratory diagnostic techniques and is not inconsistent with the other substantial evidence in [the] case record, [it will be given] controlling weight.'" *Orn*, 495 F.3d at 631(quoting 20 C.F.R. § 404.1527(d)(2)). "If a treating physician's opinion is not given 'controlling weight' because it is not 'well-supported' or because it is inconsistent with other substantial evidence in the record, the [Social Security] Administration considers specified factors in determining the weight it will be given." *Id*. "Those factors include the '[l]ength of the treatment relationship and the frequency of examination' by the treating physician; and the 'nature and extent of the treatment relationship' between the patient and the treating physician." *Id*. (citing 20 C.F.R. § 404.1527(d)(2)(i)-(ii)). "Additional factors relevant to evaluating any medical opinion, not limited to the opinion of the treating physician, include the amount of relevant evidence that supports the opinion and the quality of the explanation provided; the consistency of the medical opinion with the record as a whole; the specialty of the physician providing the opinion; and '[o]ther factors' such as the degree of understanding a physician has of the [Social Security] Administration's 'disability programs and their evidentiary requirements' and the degree of his or her familiarity with other information in the case record." *Id*. (citing 20 C.F.R. § 404.1527(d)(3)-(6)). Nonetheless, even if the treating physician's opinion is not entitled to controlling weight, it is still entitled to deference. *See id*. at 632 (citing SSR 96-02p at 4 (Cum. Ed. 1996)). Indeed, "[i]n many cases, a treating source's medical opinion will be entitled to the greatest weight and should be adopted, even if it does not meet the test for controlling weight." SSR 96-02p at 4 (Cum. Ed. 1996).

"Generally, the opinions of examining physicians are afforded more weight than those of non-examining physicians, and the opinions of examining non-treating physicians are afforded less weight than those of treating physicians." *Orn*, 495 F.3d at 631 (citing 20 C.F.R. § 404.1527(d)(1)-(2)); *see also* 20 C.F.R. § 404.1527(d). Accordingly, "[i]n conjunction with the relevant regulations, [the Ninth Circuit has] developed standards that guide [the] analysis of an ALJ's weighing of medical evidence." *Ryan v. Comm'r of Soc. Sec.*, 528 F.3d 1194, 1198 (9th Cir.

United States District Court
Northern District of California

2008) (citing 20 C.F.R. § 404.1527). "'To reject [the] uncontradicted opinion of a treating or examining doctor, an ALJ must state clear and convincing reasons that are supported by substantial evidence.'" *Id.* (quoting *Bayliss v. Barnhart*, 427 F.3d 1211, 1216 (9th Cir. 2005) (citing *Lester v. Chater*, 81 F.3d 821, 830-31 (9th Cir. 1995)). "'If a treating or examining doctor's opinion is contradicted by another doctor's opinion, an ALJ may only reject it by providing specific and legitimate reasons that are supported by substantial evidence.'" *Id.* (quoting *Bayliss*, 427 F.3d at 1216).[3] Opinions of non-examining doctors alone cannot provide substantial evidence to justify rejecting either a treating or examining physician's opinion. *See Morgan*, 169 F.3d at 602. An ALJ may rely partially on the statements of non-examining doctors to the extent that independent evidence in the record supports those statements. *Id.* Moreover, the "weight afforded a non-examining physician's testimony depends 'on the degree to which they provide supporting explanations for their opinions.'" *See Ryan*, 528 F.3d at 1201 (quoting 20 C.F.R. § 404.1527(d)(3)).

Ms. Norte contends that the ALJ erred because he "did not give any weight, let alone

---

[3] Although the type of reasons needed to reject either a treating or an examining physician's opinion is the same, the amount and quality of evidence in support of those reasons may be different. As the Ninth Circuit explained in *Lester*:

> Of course, the type of evidence and reasons that would justify rejection of an examining physician's opinion might not justify rejection of a treating physician's opinion. While our cases apply the same legal standard in determining whether the Commissioner properly rejected the opinion of examining and treating doctors— neither may be rejected without 'specific and legitimate' reasons supported by substantial evidence in the record, and the uncontradicted opinion of either may only be rejected for 'clear and convincing' reasons—we have also recognized that the opinions of treating physicians are entitled to greater deference than those of examining physicians. *Andrews*, 53 F.3d at 1040-41; *see also* 20 C.F.R. § 404.1527(d). Thus, reasons that may be sufficient to justify the rejection of an examining physician's opinion would not necessarily be sufficient to reject a treating physician's opinion. Moreover, medical evidence that would warrant rejection of an examining physician's opinion might not be substantial enough to justify rejection of a treating physician's opinion.

*Lester*, 81 F.3d at 831 n.8.

United States District Court
Northern District of California

1    'controlling weight' to Dr. Roache, the treating physician." Pl.'s Mot., ECF No. 18 at 23.  Here,

2    Dr. Roache is a treating physician who specializes in orthopedic treatment.  The Code of Federal

3    Regulations provide that generally "more weight [will be given] to the opinion of a specialist

4    about medical issues related to his or her area of specialty than to the opinion of a source who is

5    not a specialist." 20 C.F.R. § 404.1527.  Although the ALJ did not explicitly state that he provided

6    Dr. Roache with controlling weight, he stated generally that he provided controlling weight to the

7    treating physician.  The ALJ also found a limitation of "no more than 15 pounds with the right

8    upper extremity.  AR 14.  This is consistent with Dr. Roache's opinion.

9        In addition to arguing that the ALJ failed to consider Dr. Roache's opinion and provide it

10   controlling weight, Ms. Norte argues that the ALJ improperly rejected the opinion of Dr. Conrad,

11   an examining physician.  The Commissioner argues that the ALJ did not have to consider Dr.

12   Conrad's opinion "because it was inconsistent with the controlling treating physician's opinion

13   and other doctors' report and because she was discharged from treatment in June 2002."

14   Comm'r's Opp'n and Cross-mot., ECF No. 21 at 5.  With respect to Drs. Roache's and Conrad's

15   opinions, it does not appear that the ALJ rejected their opinions.  The problem is that the ALJ

16   described each medical opinion provided in the record but did not provide any analysis as to the

17   weight given to any medical opinion.  *See* SSR 96-2P (explaining that a treating source opinion,

18   even if inconsistent with other substantial evidence in the record, must be afforded deference and

19   weighed using all the factors listed under 20 C.F.R. § 404.1527).

20       The Commissioner argues that the ALJ "implicitly rejected" Drs. Ben-Aviv's and Gleason's

21   opinions that found an occasional manipulative limitation.  Comm'r's Opp'n and Cross-mot., ECF

22   No. 21 at 5.  The reasoning for this rejection, the Commissioner explains, is that both opinions

23   "relied on an August 2008 examination and 'a current evaluation' and proffered their opinions

24   more than two and a half years after that day." *Id.* (citation omitted).  Second, this is not a

25   reversible error because of Ms. Norte's "DLI and the controlling weight that the ALJ gave to the

26   treating sources." *Id.*  Despite the Commissioner's arguments, the court cannot provide post-hoc

27   rationalizations for the ALJ's decision.  *See SEC v. Chenery Corp.*, 332 U.S. 194, 196 (1947).

28

C-12-01317-LB
ORDER

1   Therefore a remand to the agency with instructions to conduct a proper inquiry into Drs. Ben-

2   Aviv's, Gleason's, Conrad's, and Roache's opinions is appropriate.

3   **B.  ALJ's RFC & Hypothetical**

4       Ms. Norte argues that the ALJ's RFC is not supported by substantial evidence.  Pl.'s Mot.,

5   ECF No. 18 at 19.  Specifically, she argues that the ALJ failed to include a manipulative limitation

6   on occasional reaching, handling, fingering, and feeling.  *Id.* at 19-20.  The ALJ rejected the

7   manipulative limitation in his decision.  *See* AR 18.  Specifically, he stated, "that the hypothetical

8   questions posed by the claimant's attorney are not supported by the evidence as a whole."  AR

9   18.[4]  In light of the court's holding to remand and allow the ALJ to conduct a proper inquiry into

10   Drs. Raoche's, Conrad's, Ben-Aviv's, and Gleason's opinions, the ALJ should reconsider the RFC

11   and hypothetical.

12       In support of this manipulative limitation, Ms. Norte directs the court to Drs. Roache's,

13   Conrad's, Ben-Aviv's, and Gleason's opinions.  Pl.'s Mot., ECF No. 18 at 19-20.  First, Ms. Norte

14   contends that Dr. Roache's opinion that Ms. Norte should not engage in "forceful gripping" or

15   "lifting over 15 pounds with the right upper extremity" supports the manipulative limitation.  *Id.* at

16   19.  Second, Ms. Norte points to Dr. Conrad's opinion, precluding Ms. Norte from "repeated

17   torque-like movements, repeated pushing, and pulling and power grasping with the right dominant

18   extremity."  *Id.* at 19-20.  Dr. Ben-Aviv, an examining physician, found "manipulative restrictions

19   in terms of grasping reaching, and inferring items should be limited to only an occasional

20   frequency secondary to potential worsening of her stress injury as well as some decreased

21   sensation in her fingers."  AR 175.  Lastly, Dr. Gleason, a non-examining physician, only found

22   such manipulative limitation on the right side.[5]  *See* AR 180.

23

24   [4]  To the extent that the ALJ is implicitly rejecting Drs. Ben-Aviv's and Gleason's opinions, as the
     Commissioner contends, such conclusory reasoning is insufficient to reject these physicians'

25   opinions.  *See* Comm'r's Opp'n and Cross-mot., ECF No. 21 at 5.

26   [5]  There is a mix of information in the record.  The undersigned observes that Dr. McCarroll did
     not find that Ms. Norte had medial epicondylitis, even though he found that the symptoms were

27   "suggestive."  AR 257.  He also did not find any irritation or entrapment of the ulnar nerve in the
     right elbow.  AR 257.  Because Dr. McCarroll's opinion appears to conflict with Drs. Ben-Aviv

28   and Gleason, the undersigned finds that remand is proper as opposed to awarding benefits.

United States District Court
Northern District of California

Ms. Norte's counsel's hypothetical concerned an occasional limitation on the left and right side. AR 54. Despite Dr. Ben-Aviv's opinion, it is not clear whether Ms. Norte's manipulative limitation only concerned the right upper extremity, as indicated by Dr. Gleason. Accordingly, the court finds that it is appropriate to remand to allow the ALJ to conduct a proper inquiry.

**C. Ms. Norte's Credibility**

Ms. Norte contends that the ALJ erred by discrediting Ms. Norte's testimony regarding her subjective symptoms. Pl.'s Mot., ECF No. 18 at 30. To determine whether a claimant's testimony about subjective pain or symptoms is credible, the ALJ must engage in a two-step analysis. *See Vasquez*, 572 F.3d at 591 (citing *Lingenfelter v. Astrue*, 504 F.3d 1028, 1035-36 (9th Cir. 2007)). First, the ALJ must determine whether the claimant has presented objective medical evidence of an underlying impairment that reasonably could be expected to produce the alleged pain or other symptoms. *See Lingenfelter*, 504 F.3d at 1036. Second, if the claimant meets the first test and there is no evidence of malingering, the ALJ can reject the claimant's testimony about the severity of his symptoms only by offering specific, clear, and convincing reasons for doing so. *Id.* When the ALJ finds a claimant's testimony not reliable, the ALJ must "specifically identify what testimony is credible and what testimony undermines the claimant's complaints." *Morgan*, 169 F.3d at 499. This court defers to the ALJ's credibility determination if it is supported by substantial evidence in the record. *See Thomas*, 278 F.3d at 959.

Here, the ALJ found that Ms. Norte's impairments could have reasonably caused the alleged symptoms, but he found that her statements about the "intensity, persistence, and limiting effect of her symptoms" were not credible to the extent that they were inconsistent with the ALJ's determination of the RFC. AR 17. In so finding, the ALJ did not state that Ms. Norte was malingering. *See* AR 17. The question remaining then is whether the ALJ rejected Ms. Norte's testimony regarding her symptoms with specific, clear, and convincing reasons.

In finding that Ms. Norte was not credible, the ALJ reasoned that the "weight of the objective evidence" did not support the "claims of disabling limitations to the degree alleged." AR 17. In support of his finding, he referred to the EMG and NCS results, which "showed no abnormalities

United States District Court
Northern District of California

1  in the ulnar nerve of the right elbow."  AR 17.  This, however, is not a legitimate reason for

2  rejecting Ms. Norte's testimony.  *Light v. Soc. Sec. Admin.*, 119 F.3d 789, 792 (9th Cir. 1997)

3  (holding that an ALJ may not discredit a claimant's testimony as to the severity of subjective

4  symptoms solely on the basis that it is not supported by objective medical evidence).

5      The Commissioner argues that the ALJ properly discredited Ms. Norte's testimony for three

6  reasons: 1) Ms. Norte "received mostly limited and conservative treatment despite elective

7  surgery; 2) Ms. Norte's doctors determined that she did not "need any further surgery or any

8  additional treatment despite her ongoing complaints;" and 3) lack of objective medical evidence

9  supporting Ms. Norte's allegations of her pain and other symptoms.  Comm'r's Opp'n and Cross-

10  mot., ECF No. 21 at 7.  In discrediting Ms. Norte's testimony, the ALJ stated only the following:

11

12          The undersigned finds that the weight of the objective evidence does not support
           the claimant's claims of disabling limitations to the degree alleged.  EMG and NCS
13          were normal.  When seen in March 2002 Dr. Roache recommended aggressive
           physical therapy.  Dr. McCarroll was unable to find anything that suggesting
14          irritation or entrapment of the ulnar nerve and advised against further surgery.  In
           light of the EMG/NCS findings showing no abnormalities in the ulnar nerve to the
15          right elbow and Dr. McCarroll's report, Dr. Roache[] discontinued active treatment
           of the right elbow and restricted the claimant to no lifting greater than 15
16          pounds.  Dr. Conrad, the agreed medical examiner precluded the claimant from
           heavy lifting, repeated torque-like movements, repeated pushing and pulling and all
17          power grasping with right dominant extremity.

18  AR 17.  As shown above, the ALJ merely listed the facts.  Other than finding that the "objective

19  evidence" does not support Ms. Norte's allegations of disabling pain, the ALJ did not provide any

20  analysis as to the reason that Ms. Norte should be discredited.  Consequently, even though the

21  Commissioner offers several reasons why Ms. Norte is not credible, the court cannot provide post-

22  hoc rationalizations.  *See SEC v. Chenery*, 332 U.S. 194, 196 (1995).  The ALJ's explanation for

23  finding that rejecting Ms. Norte's testimony is insufficient to meet the specific and legitimate

24  standard articulated by Ninth Circuit case laws.  Therefore, the court finds that the ALJ improperly

25  found that Ms. Norte's testimony was not fully credible.

26  **III.  REMAND FOR CONSIDERATION**

27      It is within the court's discretion to remand a case either for further administrative proceedings

28

C-12-01317-LB
ORDER

1   or for an award of benefits.  *See McAllister v. Sullivan*, 888 F.2d 599, 603 (9th Cir. 1989).  Here,

2   the record is not developed fully, and the court thus remands to the ALJ.

3                                              **CONCLUSION**

4        For the foregoing reasons, the court **GRANTS** Ms. Norte's motion and **DENIES** the

5   Commissioner's motion.  The matter is remanded for further proceedings consistent with this

6   order.

7            This disposes of ECF Nos. 18 and 21.

8   **IT IS SO ORDERED**.

9   Dated: June 24, 2013

10

11                                                    _____

12                                                    LAUREL BEELER
                                                      United States Magistrate Judge
13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

United States District Court
Northern District of California